Oscar **WATKINS** and Beulah **Watkins**, Plaintiffs,

v.

**UNITED STATES of America,** Defendant.

No. 78–3011.

United States District Court, M. D. Tennessee, Nashville Division.

Jan. 8, 1980.

---

Doyle E. Richardson, Tullahoma, Tenn., for plaintiffs.

Margaret Huff, Asst. U. S. Atty., Nashville, Tenn., for defendant.

## MEMORANDUM

WISEMAN, District Judge.

This cause came before the Court for trial without a jury on October 3 and 4, 1979, upon the testimony of witnesses in open Court, the depositions on file, the statements of counsel, and the whole record in the cause. The Court took the matter under advisement, requested counsel to submit proposed findings of fact and conclusions of law and to submit written briefs and argument which has now been done.

This is an action for medical malpractice. Jurisdiction of the Court is invoked under 38 U.S.C. § 4116, and 28 U.S.C. §§ 1346(b), 2671–80. Plaintiffs seek money damages for personal injuries and loss of consortium from defendant on account of the alleged negligence of defendant's employee, Dr. Melvin L. Elson, a physician at the Veteran's Administration (VA) Hospital.

## HISTORY OF THE CASE

1. From 1937 to 1973 the skin on plaintiff Oscar Watkins' forearms became pink in the summer. Watkins and other witnesses testified that Watkins' skin was no different in the spring and summer of 1974. However, as Mr. Watkins has stated in numerous patient histories, the skin condition became worse in the early summer of 1974. Contemporaneous notations of physical examinations in 1974 indicate that the skin problem involved more than the forearms, e. g., (1) 5–24–74 physical examination by Dr. Elson: "erythematosus scaling eruption on extensor arms, hands, neck, face, central chest and upper back," and (2) 5–23–74 patient history and physical examination by Dr. Buchanan: "Each summer he develops redness on the forearms. At present he has very sharply demarkated [sic] red scaling eruption on the forearms, arms, chest and back. . . ."

2. On May 24, 1974, the first occasion when Dr. Elson saw Mr. Watkins as a patient, Dr. Elson's impression was photosensitivity, possible discoid lupus erythematosus (DLE) or possible photocontact dermatitis. He had the patient discontinue using Dial soap and Tri Salve, and prescribed a sunscreen lotion, a mild soap, and Aristocort Cream. On June 7, 1974, Watkins was better and on August 9, 1974, he was doing fairly well, so Dr. Elson continued the same treatment. On October 11, 1974, Dr. Elson noted that a skin biopsy led him to conclude that Watkins had DLE and the same treatment was continued. On December 13, 1974, Watkins was doing well; the same treatment was continued. On March 14, 1975, Watkins cancelled his appointment with Dr. Elson. On April 18, 1975, Watkins had run out of his sunscreen lotion and was getting red again; Dr. Elson kept him on the same treatment he had initiated the previous summer and added a dry skin lotion.

3. On May 16, 1975, Dr. Elson noted that Mr. Watkins' lupus was in flare, indicating that the lupus was getting worse and/or spreading. Dr. Elson decided to prescribe a mild soap, dry skin lotion, sunscreen and Aristocort Cream. He also prescribed Atabrine (100 ml. 3 times a day for 7 days, 100 ml. 2 times a day for 7 days, then 100 ml. a day) and Prednisone, as long as these drugs met with the approval of Dr. Des Prez, a VA internal medicine specialist who was treating Watkins for some serious and unexplained medical problems.

4. Dr. Elson told Watkins that his skin would probably turn yellow but that he should not be alarmed by this. The doctor did not warn Watkins about any other possible side effects of the drug Atabrine. It was the practice of Dr. Elson to tell every patient that if he had any problem that he should call the doctor. Dr. Elson does not specifically remember telling Watkins this but feels that he did as part of his general practice and routine.

5. Watkins obtained his medication at the VA Hospital, took the first dosage there on Friday May 16 and returned to his home some 70 miles from Nashville. He took the medicine as prescribed Saturday and Sunday. On Sunday he noticed a worsening of his rash and swelling. He did not call the doctor upon noticing this but continued to take the medicine. He was admitted to the

VA Hospital on Wednesday, May 21, 1975, with a diagnosis, *inter alia,* of "Atabrine hypersensitivity—characterized by excoriative dermatitis—resolved off Atabrine."

6. Mr. Watkins was discharged on May 28, 1975, with a diagnosis of "dermatitis rapidly resolved."

7. Mr. Watkins was readmitted on June 10, 1975, when his exfoliative dermatitis was exacerbated. His hospital course was described as follows:

The patient was admitted because of persistent dermatologic problem and a fever. The fever, however, had only been noted in the clinic and was afebrile by the time he reached the floor, never the less (sic) blood and urine cultures were obtained and he subsequently returned negative. Pertinent to the patient's rash ANA and latex fixation each times 2 returned negative. The patient was placed on prednisone 30 mg. a day and over the course of the next three weeks demonstrated dramatic improvement. In addition he received 0.1 percent Kenalog cream and hydrocortisone cream. By the time of discharge his rash had all but resolved although large confluent areas of darker pigmentation was (sic) still present.

He was discharged on July 2, 1975.

8. Mr. Watkins was readmitted to the VA Hospital on December 23, 1975, where he was examined: "Skin revealed wide spread (sic) erythematosus and bullous lesions, patchy distributed over trunk and extremities with oozing serous material without pus."

9. His discharge from this hospitalization reads:

The patient's initial hospital course was relatively benign since he was placed on prednisone which was rapidly tapered over the first week. Skin biopsy was done prior to institution of this therapy. Consultation with the dermatologist Dr. Elson felt biopsy was compatible with erythema multiforme. Fluorescent stains failed to reveal evidence for pemphigus vulgaris and discoid lupus or bullous pemphigoid. The patient's rash began to exacerbate with rapid decrements in his prednisone dosage and at the end of the first week of hospitalization it was felt that he had developed bullous erysipelas of his left ankle. Cultures of fluid in his bullous lesion grew staph aureus and beta hemolytic strep group A. He responded to high dose prednisone, methicillin and penicillin and after he became afebrile he was switched to dicloxacillin and penicillin by mouth. He continued to do well over the following 10 days after which his antibiotics were discontinued. His rash had gradually resolved however a large scab was present over the previously bullous lesion on the ankle. After discontinuance of antibiotics the patient became febrile for several days after which the scab on the ankle lesion was removed revealing a deep burrowing ulcer from which staph aureus and e. coli were grown. He then responded well to daily debridement and to standard antibiotic therapy and the remainder of his hospital course was benign. Following a two week course of dicloxacillin this antibiotic was discontinued and the patient did not exacerbate again in the hospital. His prednisone dosage was gradually tapered in the hospital to a maintenance dosage of 10 mg. per day which was continued to the time of discharge. The patient and his wife were instructed in the care of the wound, which was improving rapidly. He was therefore considered maximum hospital benefit and was discharged to the care of Dr. Des Prez in the Outpatient clinic who will see the patient on February 13, 1976.

10. Mr. Watkins testified that skin eruptions came and went over a two year period until he received antibiotic treatment from another physician. He said that his skin condition became benign after this, but never retreated to its original status prior to the taking of the Atabrine.

11. Mr. Watkins was impotent and had suffered a general deterioration of his general health at the time of trial, and died on October 20, 1979, following the trial.

12. Counsel suggested the death of plaintiff Watkins and moved the Court to

substitute his wife as personal representative and party plaintiff. This motion was granted.

## ISSUES

The issues presented by the pleadings and proof are:

1. Was Dr. Elson negligent in prescribing Atabrine without attempting to determine whether Mr. Watkins was allergic to this drug?

2. Was Dr. Elson negligent in failing to warn Mr. Watkins of the possible side effects of the drug?

3. Was Dr. Elson negligent in prescribing Atabrine for use as an outpatient rather than under controlled conditions of the hospital?

4. If Dr. Elson were negligent in any of the above respects, was such negligence the proximate cause of any and, if so, which subsequent difficulties of Mr. Watkins?

## FINDINGS OF FACT

A. *The diagnosis.*

Dr. Elson properly diagnosed Watkins' 1974 skin problem as discoid lupus erythematosus. In May 1974 the physical appearance of the rash as well as the history of the rash appearing in the summer led Dr. Elson to consider DLE as a diagnosis. In a skin biopsy report dated August 30, 1974, the pathologist's diagnosis was "Focal perivascular lymphocytic infiltrate with focal liquefactions, degeneration of the basal layer" with a comment that the "lesion is not diagnostic of lupus but lupus cannot be ruled out." The skin biopsy findings together with the patient's appearance and history led Dr. Elson to conclude that Watkins had DLE. The Court finds that this conclusion was a reasonable diagnosis based on sound medical judgment.

B. *The treatment.*

Dr. Elson's initial treatment program for Watkins' DLE consisted of removal of a possible sun-sensitizing soap and prescriptions for a mild soap, a sunscreen lotion, and Aristocort Cream. Despite the continuation of the conservative treatment in April 1975, Mr. Watkins' lupus was in flare on May 16, 1975. Dr. Elson then made a reasonable decision to prescribe Atabrine and Prednizone for Mr. Watkins. Atabrine has been used in the treatment of DLE for many years. It is currently the drug of choice and is used when more conservative treatment is not controlling the erythema and the disease is in flare. Dr. Elson chose the proper dosage level for the Atabrine, 300 ml. a day for a week, 200 ml. a day for a week, followed by 100 ml. a day.

C. *The failure to warn.*

When he prescribes Atabrine, Dr. Elson always tells a patient that his skin would probably turn yellow but that the patient should not be alarmed by this. It was Dr. Elson's practice to tell every patient that if he has any problem he should call Dr. Elson. Dr. Elson does not warn the patient about any other possible side effect of Atabrine, including exfoliative dermatitis or erythema multiforme. Nor does Dr. Elson specifically tell a patient that he should call if his rash gets worse.

Exfoliative dermatitis and erythema multiforme are distinctly uncommon side effects of Atabrine and a physician is not required under accepted medical practice to warn a patient about the possibility of these diseases as a side effect. Acceptable medical practice in dermatology requires that, in addition to telling the patient the name and dosage of the Atabrine, a dermatologist should tell the patient about the yellowing discoloration of the skin that will result from the Atabrine. It is implied in the doctor-patient relationship that the patient will contact the doctor if he does not do well; sometimes this is specifically said to the patient, sometimes not. Thus, Dr. Elson did not deviate from acceptable medical practice by not warning Watkins of the rare side effects of Atabrine.

There are no practical tests available to a physician to determine whether a patient will suffer side effects from a drug he has never taken before. Therefore, Dr. Elson clearly was not deviating from accepted medical practice in not testing Mr. Watkins for a possible allergy to Atabrine.

### D. *The failure to hospitalize.*

It is very uncommon to hospitalize a patient with DLE. A dermatologist should not hospitalize a DLE patient simply to see how he will react to initial or subsequent dosages of 300 ml. of Atabrine. Thus, Dr. Elson's treatment of Watkins on an out-patient basis was proper.

### E. *Causation.*

#### 1. May-June 1975 Exfoliative Dermatitis

Mr. Watkins' exfoliative dermatitis occurred from May 18 to June 1975 and was probably caused by a reaction to the drug Atabrine. Although Atabrine may have caused the exfoliative dermatitis, this skin disease was not the proximate result of any negligent conduct by the defendant.[1]

At the time of his July 2, 1975, discharge from the hospital, Mr. Watkins' exfoliative dermatitis had cleared on systemic steroids. The rash had all but resolved although large confluent areas of darker pigmentation were still present. A topical steroid (Kenalog Cream) and a mild soap continued to be prescribed. By July 11, 1975, the skin was virtually healed. On October 3, 1975, and November 11, 1975, Watkins complained of having a rash "all over." There is no description of the rash in the medical records which would indicate a recurrence of exfoliative dermatitis.

#### 2. December 1975—January 1976

##### Erythema Multiforme and Ulcer on Ankle

Mr. Watkins' erythema multiforme occurred in December 1975 and was not caused by a reaction to Atabrine. When this skin disease developed with characteristic large blisters, Dr. Buchanan, the in-patient dermatologist, thought that the erythema multiforme was very possibly a drug eruption and suggested that all medications except perhaps steroids be discontinued. Since Watkins was no longer taking Atabrine at that time, other drugs were suspected as causing the erythema multiforme.

A recurrence of exfoliative dermatitis could have been caused by Atabrine; however, this disease did not recur in December 1975. Rather, Watkins developed erythema multiforme, a different skin disease which was not caused by a six-month delayed reaction to Atabrine.[2]

An additional problem which Watkins had in January 1976 was a burrowing ulcer caused by a staph infection in the ankle. The presence of a staph infection which can cause erythema multiforme further diminished any remote possibility that Atabrine caused the erythema multiforme.

#### 3. Scar on forearm

Mr. Watkins testified that skin fell off his forearm resulting in a large scar. It is not clear when this took place, but in any event it did not occur during the May or June 1975 hospitalizations. The medical records for these hospitalizations do not mention any ulcers. Also, deep ulceration is uncommon in connection with exfoliative dermatitis, the disease which Watkins had at that time. Therefore, the scar on Mr. Watkins' forearm did not result from his Atabrine reaction.

---

1. Although it is not necessary to rule on the Government's claim of contributory negligence since the plaintiff has not proven any negligent conduct by the Government, the Court notes that there is evidence that Mr. Watkins worsened or perhaps caused his exfoliative dermatitis by exposing himself to sunlight. Although Mr. Watkins testified that he did not go out in the sun for any length of time and always wore long-sleeved shirts, the medical records for the May 21, 1975, hospital admission show that Mr. Watkins' face and neck were well-tanned.

Also, photographs taken of Mr. Watkins about a year later show a much more severe rash above the waist and on the forearms, thus indicating that Watkins went out in the sun without a shirt on. Sun exposure can cause or can exacerbate exfoliative dermatitis.

2. Dr. Elson testified that Atabrine did not cause the erythema multiforme, that a skin reaction occurring six months after discontinuance of Atabrine is unlikely, and the skin biopsy was compatible with erythema multiforme.

**4. Impotence**

Mr. Watkins claims he has been impotent since around the time he took Atabrine in May 1975. However, Watkins has Lariche Syndrome in which impotence is a common symptom. The impotence was caused by an inadequate supply of blood to the penis, not by a reaction to Atabrine. Dr. Elson's opinion that Atabrine did not cause impotence is supported by the references to atrophic genitalia in physical exams which were conducted prior to May 16, 1975.

**5. Other medical problems**

Mr. Watkins' other medical problems were not caused by or worsened by a reaction to Atabrine. His pre-existing medical problems were not worsened by any reaction to Atabrine. Moreover, Mr. Watkins' Hodgkins Disease and any other medical problem which developed or was discovered after May 16, 1975, were not caused by a reaction to Atabrine.

## CONCLUSIONS OF LAW

Given the facts in this case, the Court concludes that the defendant was not negligent. The applicable statute in this case, T.C.A. § 23–3414, provides in pertinent part:

(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b);

(1) the recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) that the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) as a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

The law presumes that a medical practitioner has discharged his full duty to a patient and will not presume negligence from the fact that the treatment was unsuccessful. Liability for malpractice must depend on whether or not a physician is lacking in reasonable degree of learning, skill, and experience which is ordinarily possessed by others of his profession. *Redwood v. Raskind*, 49 Tenn.App. 69, 350 S.W.2d 414, 417 (1961). Physicians are not insurors of a patient but are only liable for negligence. *French v. Fischer*, 50 Tenn. App. 587, 362 S.W.2d 926, 929 (1962). The duty of a physician is to use his best judgment in the treatment of a patient. *Wotten v. Curry*, 50 Tenn.App. 549, 362 S.W.2d 820, 822 (1961).

The law allows physicians a large amount of discretion in treating a patient, which was defined in *McPeak v. Vanderbilt University Hospital*, 33 Tenn.App. 76, 229 S.W.2d 150 (1950), as:

Physicians and surgeons must be allowed a wide range in the exercise of their judgment and discretion. The science of medicine is not an exact science. In many instances there can be no fixed rule by which to determine the duty of a physician, but he must often use his own best judgment and act accordingly. By reason of that fact the law will not hold a physician guilty of negligence . . ., even though his judgment may prove erroneous in a given case, unless it be shown that the course pursued was clearly against the course recognized as correct by the profession generally. As long as there is room for an honest difference of opinion among competent physicians, a physician who uses his own best judgment cannot be convicted of negligence, even though it may afterward develop that he was mistaken. . . .

*Id.* at 80, 229 S.W.2d at 152.

In the case at bar, Dr. Elson's diagnosis that Oscar Watkins had discoid lupus erythematosus was a reasonable diagnosis. His initial treatment was conservative and excellent. When Watkins' DLE worsened and was in flare, Dr. Elson followed the recognized practice in dermatology by prescribing an antimalarial drug. He chose

Atabrine, the currently preferred antimalarial, and prescribed proper dosage levels.

■ Dr. Elson adequately warned Mr. Watkins about the side effects of Atabrine by informing Watkins that his skin would turn yellow from the drug. Under the recognized standard of acceptable professional practice in the medical profession and the specialty of dermatology, Dr. Elson was not required to warn Mr. Watkins about rare side effects including exfoliative dermatitis and erythema multiforme. Moreover, under this standard Dr. Elson was not required to test Watkins for a possible sensitivity to Atabrine, given the fact that no test was available. Finally, Dr. Elson exercised sound medical judgment in not hospitalizing Mr. Watkins.

Thus, the plaintiffs have failed to show that Dr. Elson, the defendant's agent, acted with less than ordinary and reasonable care or failed to act with ordinary and reasonable care in accordance with the recognized standard of acceptable professional practice in the medical profession and the specialty of dermatology. The defendant is not liable for any injury suffered by the plaintiffs.