IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON

_____

**EARNESTINE COLE,**

Plaintiff-Appellant,

Vs.

**STATE OF TENNESSEE,**

Defendant-Appellee.

Claims Commission No. 97487
C.A. No. 02A01-9801-BC-00004

**FILED**

**July 16, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

_____

FROM THE TENNESSEE CLAIMS COMMISSION
THE HONORABLE MARTHA BRASFIELD, COMMISSIONER

William B. Raiford, III; Merkel & Cocke, P.A.
of Clarksdale, Mississippi
For Appellant

Beauchamp E. Brogan, General Counsel
JoAnn C. Cutting, Assistant General Counsel
For Appellee

*AFFIRMED*

Opinion filed:

**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**

**ALAN E. HIGHERS, JUDGE**

**DAVID R. FARMER, JUDGE**

This is a medical malpractice case tried by the Tennessee Claims Commission.

Claimant/Appellant Earnestine Cole (Cole) appeals from the judgment of the Claims

Commission for Defendant/Appellee State of Tennessee. Cole filed this complaint alleging that

she had a tubal ligation and sterilization performed while a patient at the Regional Medical Center in Memphis, Tennessee. She avers that she was under the care and treatment of Dr. Lynn Ware, a medical resident employee of the State of Tennessee at the University of Tennessee School of Medicine, who was under the supervision of Dr. Bertram Buxton, a professor at the university. Cole essentially alleges that the defendant, State of Tennessee, through its employees, breached the recognized standard of acceptable professional practice in its medical treatment, thus resulting in her becoming pregnant after the operation was performed.

After an evidentiary hearing, Commissioner Martha Brasfield filed a thorough and comprehensible order which we adopt as a part of this Opinion:

> The claimant, Ms. Ernestine Cole, filed a claim for damages against the defendant, the State of Tennessee, alleging that professional malpractice was committed upon her by employees of the University of Tennessee.
>
> The Tennessee Claims Commission has jurisdiction over this claim pursuant to Tenn. Code Ann. section 9-8-307 (a)(1)(D).
>
> The parties stipulated that the physicians named in this lawsuit, Dr. Lynn Ware and Dr. Bertram Buxton, were employees of the State of Tennessee at the time the alleged malpractice occurred.
>
> On March 9, 1988, the claimant, a 35-year-old single mother of three children, had a tubal ligation and sterilization performed at the Regional Medical Center in Memphis, Tennessee. Prior to the surgery, the claimant signed a Consent for Operation which stated a failure rate of 1:300-400 for the type of sterilization to be performed. The surgery was performed by Dr. Lynn Ware, a medical resident at the University of Tennessee, under the supervision of Dr. Bertram Buxton, a professor at the

2

University of Tennessee. The type of ligation which Dr. Ware performed is known as a silastic band tubal sterilization. In this type of procedure, a segment of each fallopian tube is grasped with a surgical instrument and doubled (or "knuckled"), and a tiny silicone (silastic) ring is slipped over the "knuckle" to achieve occlusion of the tube.

Dr. Ware had performed approximately 50 tubal ligations prior to the claimant's surgical ligation. Her operative report, dictated less than an hour after she performed the claimant's tubal ligation, stated that she placed a silastic ring on each fallopian tube and then injected methylene blue dye through the uterus and into the tubes to verify occlusion. No spillage of dye was observed from either fallopian tube. Dr. Ware's notes indicate that Dr. Buxton was in attendance during the surgery. Dr. Buxton testified that he was "quite diligent" in his role as an attending surgeon, and that it was his practice to check his students' surgical work before the surgical incision was closed. Although he did not specifically recall attending the claimant's surgery, he testified that he believed that he was present during the surgery and that he inspected Dr. Ware's work prior to the closing of the surgical wound. He signed the operative report (which was dictated by Dr. Ware approximately twenty to thirty minutes after the surgery) as well as the progress notes.

In October of 1988, the claimant discovered that she was pregnant with twins, who were delivered at Baptist Memorial Hospital by Dr. Marva Souder in February of 1989. Immediately after the delivery of the twins, a second tubal ligation procedure was performed by Dr. Souder. Dr. Souder's operative notes state:

3

FINDINGS: Bilaterally normal appearing fallopian tubes. There was no ring found on the right tube. On the left tube, the Fallope ring was on the mesosalpinx, but the tube did not appear to be occluded.

TECHNIQUE: . . . The right fallopian tube was grasped . . . and brought to the surface in its entire length with the findings as noted above. The tube was grasped in an avascular area to form a knuckle of tube. A free-tie of . . . plain catgut was placed at the base of the knuckle. A second free-tie was placed adjacent to the first tie. The knuckle of tube was then excised and the resulting pedicle was inspected for hemostasis. It was then released to the abdomen. The same procedure was performed on the left tube with findings as noted above . . . .

The excised portions of the tubes were sent to a pathology laboratory for routine analysis. According to Dr. Thomas Chesney, the pathologist who examined the specimens, the purpose of the analysis was to determine whether the fallopian tubes had been entirely transected by the second tubal ligation procedure. Following his examination of the specimen, Dr. Chesney issued the following report:

A. PORTION OF LEFT FALLOPIAN TUBE: Received is a 2.4 cm long x 0.4 x 0.5 cm, white-tan, tubular structure enveloped in a thin, pink-tan,

4

fibrous membrane. The tissue is consistent with a portion of fallopian tube. The fimbriated end is identified. A fallope ring is present at the proximal end of the specimen . . . .

B. PORTION OF RIGHT FALLOPIAN TUBE: Received in fixative is a 2.2 cm in length x 0.8 x 0.6 cm diameter, white-tan, tubular portion of tissue enveloped in a thin, purple-tan, fibrous membrane. The tissue is consistent with a portion of fallopian tube and the fimbriated [sic] end is identified . . . .

The report concluded that the specimens were two "completely transected negative segment[s] of oviduct.["]

In approximately May of 1990, at the claimant's request, Dr. Chesney re-examined the fallopian tube specimens (which had been preserved in paraffin after the initial laboratory analysis). The purpose of this examination was to determine whether the segment removed by Dr. Souder showed evidence of tubal occlusion. Dr. Chesney re-sectioned and re-examined the fallopian tube specimens and issued the following report:

NOTE: The remaining available tissue from the fallopian tube segments . . . was submitted for sectioning on May 15, 1990 . . . The cross sections do not reveal tubal obstruction, <u>nor would they be expected to</u> since the pathological analysis of these tubes was directed to ascertainment of the

5

completeness of the tubal interruption procedure of February 25, 1989.  The portions of left tube . . . present on the slides may not represent the part immediately adjacent to the grossly identified fallope ring, nor was it intended that the portions of the right tube . . . represent the previously ligated area.  The latter may indeed still remain in the patient.  These recut slides . . . first as the original slides . . . reflect portions of the tubes apparently uninvolved by the original tubal ligation procedure of 1988, thus no opinion can be rendered as to the completeness of that procedure on the basis of this microscopic material.

The claimant maintains that the tubal ligation performed by Dr. Ware in March of 1988 was negligently done.  The claimant further avers that Dr. Buxton failed to properly supervise the procedure performed by Dr. Ware.  As a result of this alleged malpractice, the claimant maintains that she has suffered physical, mental and monetary damages.  She sues the defendant for the recovery of the costs associated with the pregnancy and birth of the twins, for the costs of the second tubal ligation, for pain and suffering, and for mental anguish.

The defendant denies malpractice in the tubal ligation procedure, and maintains that the claimant has failed to prove that Dr. Ware violated the recognized standard of acceptable professional practice in the medical profession.  The defendant holds that tubal ligations sometimes fail because the fallopian tubes "recanalize," or because occluding devices (in this case,

silastic rings) can "migrate," break, or slip post-operatively, either of which circumstances could arise absent a physician's malpractice. The defendant points out that the claimant signed a consent for operation form which specifically stated that tubal ligation procedures fail at a rate of 1:300-400.

The claimant's burden of proof in this claim is set out in Tenn. Code Ann. Section 29-26-115(a): "In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b) (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred; (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standards; (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred." Negligence may not be presumed from the fact that the treatment was unsuccessful. (See, Johnson v. Lawrence, 720 S.W.2d 430 (Tenn. Ct. App. 1986) and Watkins v. United States, 482 F. Supp. 1006 (M.D. Tenn. 1980).

The parties essentially agreed that the tubal ligation procedures described by Dr. Ware in her operative report met the recognized standard of acceptable professional practice for tubal ligations if those procedures were performed as Dr. Ware described. The claimant alleges that the standard procedures were not performed by Dr. Ware as described in her operative notes, that Dr. Ware failed to act with ordinary and reasonable care in

7

performing those procedures, and that Dr. Buxton failed to act with ordinary and reasonable care in supervising and inspecting Dr. Ware's work. In support of her allegations, the claimant points out the following:

(1) During the second sterilization procedure, Dr. Souder found no silastic ring on the right fallopian tube;

(2) Dr. Souder observed no scarring on either fallopian tube;

(3) Dr. Souder observed that the left silastic ring was on the mesosalpinx instead of on the fallopian tube;

(4) In her initial deposition, Dr. Ware described an incorrect location for placement of the silastic rings;

(5) There was no evidence or opinion that the left silastic ring had "migrated" from another location;

(6) There was no evidence that the silastic rings used by Dr. Ware were defective or broken;

(7) Although the methylene dye test revealed no spillage of dye from the fallopian tubes, the test is not a reliable test of tubal occlusion.

With regard to the surgical procedure, itself, and the malpractice allegedly committed by Dr. Ware, the claimant's expert witness, Dr. Albert Alexander, a retired obstetrician and gynecologist, testified that Dr. Ware inappropriately placed the

8

left silastic ring on the mesosalpinx near the fimbriated end of the left fallopian tube, and had placed no ring at all on the right fallopian tube. He based his findings on Dr. Souder's operative notes. He opined the claimant's fallopian tubes should have evidenced scarring had the silastic rings been appropriately placed and remained in place for as little as 12-24 hours. Dr. Alexander further testified that a recanalization of the fallopian tubes should have left visible signs which Dr. Souder should have been able to have seen during the second sterilization procedure. Dr. Alexander also discounted the defendant's theory that the silastic rings may have broken, migrated or slipped. He stated that a broken or defective ring should have evidenced its defect during the surgery. With regard to the methylene dye test, Dr. Alexander testified that although the spillage of dye from the fallopian tubes is a certain indicator that an attempted occlusion was <u>not</u> successful, the test is "very unreliable" for proving successful tubal occlusion; therefore, the dye test performed by Dr. Ware did not prove conclusively that the silastic rings had been properly placed.

The defendant's expert witness, Dr. Dwight Pridham, a professor at the University of Louisville medical school specializing in obstetrics and gynecology and in reproductive endocrinology, opined that Dr. Souder's findings with regard to the silastic rings did not prove that the rings had been improperly placed during the first tubal ligation procedure. Dr. Pridham testified that necrosis (death of tissue) often occurs in the "knuckles" of the tube formed by the ligation process, and that these knuckles may "drop off" following successful occlusion of fallopian tubes, leaving the silastic rings "attached to what was

9

left after the necrosis had occurred, which is often the mesosalpinx below the fallopian tube." He testified that the rings may also become "epithelized" (covered with tissue) and thus may not be visible to the naked eye. Dr. Chesney, the pathologist who examined the fallopian tube segments excised by Dr. Souder, also testified that the tiny silastic rings sometimes become encapsulated with tissue and may be invisible to the naked eye. With regard to the lack of scarring, Dr. Pridham testified that "[m]ost of the time you can identify a scarred area, an area that is absent of apparent tubal lumen, but that is not always the case . . . there have been a number of occasions when I have been looking at a uterus, often at the time of hysterectomy and occasionally at the time of re-anastomosis (reversal of a tubal ligation)where it's been difficult to tell where the tube has been obstructed."

All of the physicians testified that tubal ligations can fail due to the "recanalization" of the fallopian tubes. According to Dr. Pridham, this recanalization is not always evident to the naked eye.

Further, all physicians testified and all proof indicated that the methylene blue dye test is not a perfect indicator of tubal occlusion. Spillage of blue dye from the fimbriated end of the tube indicates that the tube is not occluded; the fact that blue dye does not spill from the fimbriated end is not proof that the tube is occluded. (The proof showed that the dye may not spill from the fimbriated ends of a patent (non-occluded) tube for several reasons: (1) The dye is not properly injected into the uterus, which would constitute negligence on the part of a medical

professional; (2) The fallopian tube can spasm, shutting off the flow of the dye; (3) Another occlusion or obstruction in the tube can prevent the flow of the dye. Items 2 and 3 would not constitute negligence on the part of a medical professional.) Nevertheless, the blue dye test was the only available test which could be performed after tubal ligations which gave an indication of occlusion, and administering this test was the standard of care in this operation.

It must be found that Dr. Pridham's credentials more thoroughly qualify him to opine in the field of tubal ligations and, specifically, in the area of re-anastomosis of fallopian tubes. As was previously stated, Dr. Pridham's area of specialization is in reproductive endocrinology, and as a part of his work he has personally viewed the fallopian tubes of approximately 200 women who had undergone tubal ligations. (Dr. Pridham's field of specialization involves reversals of tubal ligations.) His credentials evidence a special knowledge in the field of sterilization by tubal ligation.

Dr. Alexander's testimony cannot be given as much credence as Dr. Pridham's for several factual reasons: (1) Dr. Alexander had never performed a tubal ligation using silastic rings; (2) He had personally seen the internal anatomy of only one patient who had previously undergone an unsuccessful tubal ligation procedure; and (3) Dr. Alexander's testimony evidenced some confusion with regard to the usage of the words "proximal" and "distal" in relation to the two ends of a fallopian tube. This confusion resulted in a misinterpretation of the pathology laboratory's findings concerning the location of the silastic ring

11

found by Dr. Souder.

Dr. Pridham's testimony effectively and credibly refutes the claimant's assertion that Dr. Souder s [sic] findings prove that malpractice was committed by Dr. Ware. Dr. Pridham gave convincing testimony that silastic bands can become displaced even when properly placed. He also gave convincing testimony concerning a fallopian tube's ability to show no immediately-visible signs of scarring and/or occlusion following successful ligation. Therefore, it would appear that even though Dr. Souder may not have found silastic rings where Dr. Ware should have placed them, this is not absolute proof that Dr. Ware incorrectly placed the rings.

Further, it must be noted that the accuracy of Dr. Souder's operative notes appears questionable when compared with Dr. Chesney's (the pathologist's) findings. First, Dr. Chesney described receiving the fimbriated ends of the left and right fallopian tubes. Dr. Souder's operative notes indicate that she excised two "knuckle[s] of tube." Dr. Chesney testified, "[i]t sounds like she's taking out a segment of the mid portion of the fallopian tube, but not taking out the distal [fimbriated] end of the tube . . . I would say that this sounds like she's done a different operation than the operation you would do to get the specimen that we got." Secondly, Dr. Souder described having observed the left silastic ring on the mesosalpinx, while Dr. Chesney's observation was that the "fallope ring [was] present at the proximal end of the specimen." According to Dr. Chesney, the "proximal end" was the cut end of the specimen -- the end closer to the uterus. Except for certain testimony of Dr. Alexander in

12

interpreting Dr. Chesney's pathology report, all the physicians who discussed the terms "proximal" and "distal" as it pertained to a fallopian tube testified that, in medical terminology, the proximal end of the fallopian tube was that part nearer to the uterus, and the distal end was that part nearer to the fimbriated end. During specific questioning regarding the location of the silastic ring on the specimen received by the pathology lab, Dr. Chesney testified that he believed that the ring "was on the tube rather than on the mesosalpinx." Dr. Chesney studied the specimen in the laboratory and, therefore, his pathological analysis of the tissue samples would have been more thorough than Dr. Souder's clinical observations. Thus, it would appear that at least two of Dr. Souder's observations -- (1) the portions of tube she excised and (2) the location of the left silastic band -- were incorrect.

In must further be noted that Dr. Souder's claim that the fallopian tubes were "brought to the surface in [their] entirety" was found by Dr. Pridham to be unusual or unlikely. Dr. Pridham explained that, while the fimbriated ends of fallopian tubes (the "distal" ends) are "somewhat loose," they are held in place near the ovaries by ligaments. Dr. Souder did not use a laparoscope during the tubal ligation procedure. Access to the fallopian tubes was gained through a small incision (typically ½" to 1", according to Dr. Pridham) made below the umbilicus. Dr. Pridham testified that "[w]ith postpartum sterilizations the exposure and visualization that you have is adequate to do a sterilization, but you do not have a very good overall visualization of the entire pelvis . . . You can see a portion of things at a time well enough to identify the tube and to pull it up and to remove a portion, but

13

not an overall visualization as you would have in a more routine laparotomy, a larger incision . . . [Y]ou would not usually be able to easily bring the entire tube through the incision at one time. You can pick up a portion and work your way down the tube to see the fimbriated end . . . That's because the tube is obviously attached to something in the pelvis . . . I really can't say it's impossible to do it, just that it would be atypical in this type of procedure to bring the entire tube in the incision." Dr. Pridham's testimony evoked additional doubt concerning the accuracy of the findings as reported by Dr. Souder's operative notes.

Dr. Souder's observations were the claimant's only evidence that Dr. Ware incorrectly placed (or failed to place) the silastic rings during the first tubal ligation procedure, but the discrepancies and oddities in her report rob it of much of its credibility. Neither Dr. Pridham nor Dr. Chesney could reconcile Dr. Souder's report with the specimens received by the pathology laboratory. Dr. Souder did not testify in this claim, and thus these discrepancies remain unreconciled.

Rule of Civil Procedure 56.05 provides in part that "[e]xpert opinion affidavits shall be governed by Tennessee Rule of Evidence 703" which states as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject,

14

the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness. [Emphasis added]

In this claim, the "underlying facts or data" on which the claimant's expert based his opinion -- the operative report of Dr. Souder -- lacks trustworthiness. The procedure described in her operative notes (i.e., lifting the entire fallopian tube through the incision) was, according to the defendant's expert witness, unlikely or unusual. More importantly, Dr. Souder's description of the portions of tube which she excised during the second tubal ligation procedure does not describe the portions of tube received by the pathological laboratory.

In Freda G. Moon v. St. Thomas Hospital, Court of Appeals, Middle Section, April 25, 1997, the court stated, "[i]f opinion testimony must be disallowed when the underlying facts indicate a lack of trustworthiness, it certainly must be disallowed when the underlying facts are inaccurate." As the claimant's expert witness, Dr. Alexander, based his opinions on Dr. Souder's operative report, and as this operative report appears to be an inaccurate and unreliable source of information, Dr. Alexander' testimony and expert opinions, which are based upon Dr. Souder's operative report, should be disallowed pursuant to Tennessee Rule of Evidence 703.

Nothing in Dr. Chesney's second laboratory analysis confirms the claimant's theory that the tubal rings were mis-

15

placed by Dr. Ware. By the time of the second analysis, the fallope ring had become separated from the remainder of the specimen, and Dr. Chesney could not locate it. Dr. Chesney re-sectioned the remaining fallopian tube specimens and did not find evidence of tubal occlusion; however, as Dr. Chesney stated, the portions of tube removed during the second sterilization were apparently uninvolved in the first sterilization procedure. If Dr. Ware placed the silastic rings in an appropriate area (which, according to the expert witnesses, is the middle third of the tube, slightly toward the uterus), one would not expect the fimbriated ends of the tubes to evidence occlusion: the occluded area of the tube would remain inside the claimant's body. Thus, the absence of occlusion in the specimens sent to the pathology laboratory does not prove that the claimant's fallopian tubes were never occluded by the first tubal ligation.

The claimant points out that Dr. Ware, in her first deposition, incorrectly described the proper location for the placement of silastic bands. In that deposition, Dr. Ware stated that the rings should be placed roughly in about the middle of the tube, out towards the fimbriated ends rather than up close to [the] uterus. This is an incorrect location, according to the physician witnesses. In her second deposition, Dr. Ware, herself, stated that the rings should be placed just a little past [the] first third of the tube, or closer to the uterus than to the fimbriated ends. The fact that Dr. Ware initially described an incorrect location, coupled with the fact that Dr. Chesney found the left fallope ring at the cut end of a sample which was 2.4 cm. long (and testified that he believed the ring to have been initially placed in that location), tends to lend weight to the claimant's position that Dr. Ware

16

simply did not know the correct location for placement of the bands and put them in the wrong place. However, there has been no testimony concerning the over-all length of the claimant's fallopian tubes. The physicians testified that the length of women's fallopian tubes varies from six to eight centimeters. If the claimant's fallopian tubes were at the shorter end of this estimate, by the time a knuckle of tube was formed and the knuckle necrosed, the ring might well have been properly placed on the middle third of the tube and still have been found 2.4 cm. from the fimbriated end.

In further support of her allegation that Dr. Ware did not properly place the rings on the fallopian tubes, the claimant submitted for introduction four studies performed by senior medical students at UT. Two studies were introduced as exhibits: (1) "Method Failures of Laparoscopic Tubal Sterilization in a Residency Training Program" [Exhibit 1a] and (2) "Chromopertubation at Laparoscopic Tubal Occlusion" [Exhibit 16]. The remaining two studies, (3) "A Model for Resident Surgical Training in Laparoscopic Sterilization" and (4) "Gross and Histologic Examination of Tubal Ligation Failures in a Residency Training Program," were introduced as exhibits Y and Z for identification purposes only, with a ruling to be made on their admissibility in the final order.

The first of these studies [Exhibit 1A] was conducted by G. Michael Henry and was presented to the UT faculty and residents by Dr. Henry as his "senior paper" in approximately May of 1988. This paper indicated a greater-than-average failure rate for tubal ligations performed by UT residents.

The second study evaluated the effectiveness of the methylene blue dye test (chromopertubation)following tubal ligations to determine if the tubes were occluded.

The third study sought to identify possible anatomical reasons for the high failure rate of tubal ligations.  This study, published in September of 1990, concluded that it was the residents' lack of expertise and the attending surgeons' failure to properly supervise the procedures that were responsible for the high failure rate.

The fourth study, published in March of 1994, suggested training techniques and for residents [sic] which were expected to lower the failure rate for future procedures.

The defendant objected to the entering these studies into evidence [sic].

The claimant suggests that these studies indicate that, more likely than not, Dr. Ware was negligent in performing the claimant's tubal ligation.  The claimant acknowledges that she did not participate in any of these studies.  There is no proof that Dr. Ware performed any of the ligations which were included in the studies or that she was interviewed in these studies.  These studies are not relevant to the issue as to whether or not Dr. Ware was negligent in performing the claimant's tubal ligation.  Studies 3 and 4 will not be admitted into evidence and will not be considered in this opinion.

With regard to Dr. Buxton's supervision of the procedure

performed upon the claimant by Dr. Ware, the operative notes reflect that Dr. Buxton was present in the operative suite. Dr. Buxton testified to an honest diligence to his role as attending physician. Dr. Buxton did not have any specific recollection about the claimant's surgery, but testified very firmly that he routinely and normally checked behind the residents, and that he would have left the operating room when he "had indeed seen that the rings were placed on what [he] agreed were the tubes, number one, and number two, waited to see whether any retrograde administration of methylene blue came through the cannula placed in the uterus and out the tubes and then [he] would have left . . . ." The claimant presented no evidence that Dr. Buxton was not in the operating suite or did not inspect Dr. Ware's work before the closing of the surgical wound. Thus, it must be found that the claimant has failed to prove her claim that Dr. Buxton was negligent in his supervision of the surgery performed upon her by Dr. Ware.

It is found that the claimant has failed to carry her burden of proving negligence on the part of Dr. Ware and/or Dr. Buxton. Thus, this claim must be dismissed.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that this claim should be, and is hereby, dismissed.

This is a direct appeal from the Tennessee Claims Commission and is governed by the Tennessee Rules of Appellate Procedure and T.C.A. § 9-8-403(a)(1) (Supp. 1997). Since this is a nonjury case, it is reviewed *de novo* upon the record with a presumption of correctness of the Commissioner's findings of fact. T.R.A.P. 13(d), *Sanders v. State*, 783 S.W.2d 948, 951 (Tenn. App. 1989).

The sole issue on appeal is whether the evidence preponderates against the Claims Commissioner's finding

that the claimant failed to show that the State employees did not conform to the standard of care.

The plaintiff's burden of proof as set out in T.C.A. § 29-26-115(a)(1980) is included in the Commissioner's order. Cole first contends that the Commissioner misapplied the plaintiff's burden of proof by requiring her to prove the physicians' negligence by more than a preponderance of evidence. Cole cites the following portion of the Commissioner's order in support of this contention:

> Dr. Pridham's testimony effectively and credibly refutes the claimant's assertion that Dr. Souder s [sic] findings prove that malpractice was committed by Dr. Ware. Dr. Pridham gave convincing testimony that silastic bands can become displaced even when properly placed. He also gave convincing testimony concerning a fallopian tube's ability to show no immediately-visible signs of scarring and/or occlusion following successful ligation. Therefore, it would appear that even though Dr. Souder may not have found silastic rings where Dr. Ware should have placed them, this is not ***absolute proof*** that Dr. Ware incorrectly placed the rings.

(Emphasis added). This argument is without merit. When this finding is placed in context with the entirety of the Commissioner's order, it is clear that the Commissioner issued her ruling based on a preponderance of the evidence standard. Cole next asserts that even if the trial court employed the proper burden of proof, the preponderance of the evidence does not support its ruling. The thrust of Cole's suit is based on the testimony of her expert, Dr. Alexander, who, in turn, based his opinion primarily on Dr. Souder's operative report of the second sterilization procedure. The preponderance of the evidence does not weigh against the Commissioner's decision to discount Dr. Alexander's testimony, since it justifiably found that Dr. Souder's report was inaccurate and unreliable.

As elucidated in the Commissioner's Order, several unresolved discrepancies exist between Dr. Souder's report and Dr. Chesney's pathology report. Namely, there were discrepancies concerning the segment of the tube that was excised by Dr. Souder and delivered to Dr. Chesney[1] and discrepancies concerning the location of the silastic band in relation to the left fallopian tube. Based on the testimony of both Dr. Chesney and Dr. Pridham, Dr. Souder's report is inconsistent with the procedure performed. Furthermore, Dr. Pridham noted that Dr. Souder's report may be unreliable due to the size of the incision, the presence of inadequate lighting, and the unlikelihood of pulling the fallopian tubes

---

[1] At trial, Dr. Pridham testified as follows:

> Q. Can you in any way reconcile this pathology report with Dr. Souder's operative report and what she described in that report?
> A. No, that really does not make a lot of sense to me. If you're doing a Pomeroy and you're taking a knuckle of tube you're not taking the fimbria. If you did a fimbriectomy, which is a different procedure, then you would have the fimbria. Those don't make sense.

in their entirety to the surface of the skin as described by Dr. Souder's report. Although Cole's expert, Dr. Alexander, attempted to reconcile the reports, the preponderance of the evidence supports the Commissioner's finding that Dr. Pridham is a more qualified expert for the reasons set forth in the Commissioner's Order. *See State v. Ballard*, 855 S.W.2d 557, 562 ("In Tennessee the qualifications, admissibility, relevancy and competency of expert testimony are matters which largely rest within the discretion of the trial court.") In light of the unreliability of Dr. Souder's report, the Commissioner was justified in discounting Dr. Alexander's testimony. *See* Tenn. R. Evid. 703 ("The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.").

In her brief, Cole raises several arguments, each of which were discussed in detail in the Commissioner's Order.[2] After an extensive review of the record, we find that the Commissioner's findings with regard to these arguments are supported by the preponderance of the evidence and the law. Although Cole did an exemplary job in demonstrating the *possibility* that the sterilization procedure was negligently performed, we are unable to hold that the preponderance of the evidence indicates that the Commissioner's findings are erroneous.

The judgment of the Commissioner is affirmed. Costs on appeal are assessed against the Appella

_____
**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**

_____
**ALAN E. HIGHERS, JUDGE**

_____
**DAVID R. FARMER, JUDGE**

_____

[2] Specifically, Cole mentions Dr. Ware's testimony regarding the appropriate location for the placement of the fallope ring, the use of methylene blue dye as a test, the absence of scarring in Dr. Souder's report, the alleged lack of evidence of alternative explanations for the failure of the sterilization, the University studies that Cole attempted to introduce into evidence, and the alleged lack of evidence demonstrating that Dr. Buxton supervised the results.